UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------------------- X
                                                              :
AURELIA MARTINEZ,                                             :
                                        Plaintiff,            :
                                                              :
                    -against-                                 :
                                                              :
NEW YORK STATE DIVISION OF HUMAN                              :
RIGHTS and JYLL TOWNES,                                       :
                                                              :
                                        Defendants.          :
                                                              :
------------------------------------------------------------- X
```

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  2/2/15

1:13-cv-1252-GHW

OPINION AND ORDER

**GREGORY H. WOODS, District Judge:**

Ms. Martinez claims that she was terminated from her provisional position as a human rights specialist at the New York State Division of Human Rights because she was pregnant and disabled. In response, the defendants assert that the plaintiff held a provisional position that automatically terminated when permanent positions were filled by other candidates. The defendants contend that candidates other than the plaintiff were selected for non-discriminatory reasons. Because no reasonable jury could find that Ms. Martinez was "disabled" within the meaning of the Rehabilitation Act, the Court GRANTS summary judgment in favor of the defendants with respect to the plaintiff's claims under the Rehabilitation Act. The plaintiff's claims that arise under the New York State Human Rights Law ("NYSHRL") are remanded to state court.

I.      **BACKGROUND**

A.      **Facts**

Ms. Martinez worked as a provisional Human Rights Specialist I ("HRS I") for the New York State Division of Human Rights ("DHR") from December 2008 until April 2011. Plaintiff's Response to Defendants Rule 56.1 Statement ("Pl. Resp. 56.1") ¶¶ 4, 22. Provisional appointments "may only be made when there is no existing viable Civil Service list for the title." *Id.* ¶ 8. Positions

held by provisional employees are eliminated by operation of law within two months following the establishment of a Civil Service list. *Id.*

On October 16, 2010, the State administered a civil service examination for permanent HRS I positions. *Id.* ¶ 9. Two hundred and fifty-seven people, including the plaintiff, took the exam. *Id.* The New York State civil service law establishes that all candidates with the highest score on the examination are eligible for appointment to permanent positions. *Id.* ¶ 11. Candidates with lower scores can be considered only when there are fewer than three candidates with higher scores. The plaintiff received the highest possible score, but she was not unique; one hundred and sixteen other candidates also received that score. *Id.* ¶ 12.

DHR had seven available permanent HRS I positions. *Id.* ¶ 12. Four of the seven positions required the candidate to be fluent in Spanish. *Id.* Those positions are referred to as "HRS I SL" positions. One of the positions required fluency in Chinese. *Id.* ¶ 13. The plaintiff reported that she spoke Spanish, and, therefore, was included on the list for consideration for the HRS I SL position. *Id.* ¶ 14. The two HRS I positions that did not require special language competency were located in Binghamton and Syracuse. *Id.* ¶ 15. The four HRS I SL positions were located in DHR's Buffalo, Upper and Lower Manhattan, and Brooklyn offices. *Id.*

On January 24, 2011, the plaintiff told Jyll Townes, the DHR's Deputy Commissioner for Regional Offices, that she was pregnant. *Id.* ¶ 80. The plaintiff asserts that Townes sarcastically replied, "I guess you are going to be a Mom and not a superwoman like me." *Id.* Ms. Townes denies that she ever made that statement. *Id.*

According to the defendants, on February 3, 2011, a representative of the DHR asked the plaintiff whether she wanted to be considered for the HRS I position in the Buffalo office; she said that she was not. Pl. Resp. 56.1. ¶¶ 16-17. The plaintiff denies that she made such a statement. Defendants' Response to Plaintiff's Revised 56.1 Statement ("Def. Resp. 56.1") ¶ 80.

On February 11, 2011, the plaintiff slipped and fell in one of the DHR's Bronx office restrooms. *Id.* ¶ 37. After the injury, the plaintiff was placed on medical leave. *Id.* According to an independent medical exam conducted on April 1, 2011, as a result of the slip and fall, the plaintiff suffered from "Sprain of the lumbosacral spine. Coccydynia. Right greater trochanteric bursitis." Letter from Mark Kramer, M.D., April 1, 2011 ("Kramer Letter") (Ex. 21 to Affidavit of Anne Bush) at 3. The plaintiff admits that she could have resumed her duties around May 15, 2011 "with certain accommodations and despite her ongoing disabilities." Pl. Resp. 56.1. ¶ 37. The plaintiff cites to Dr. Kramer's letter to support the assertion that she was "disabled" at the time, however, the medical examination recommended no restrictions on plaintiff's work as a result of her slip and fall injuries. The only restriction that Dr. Kramer suggested was that plaintiff avoid lifting "because she is now pregnant." Kramer Letter at 3. The plaintiff received worker's compensation benefits from July 2011 to May 2012. Pl. Resp. 56.1 ¶ 37.

On March 9, 2011, while on leave, the plaintiff was interviewed for the HRS I SL position. *Id.* ¶ 18. Several officials from DHR were present at the interview: Townes, Regional Directors Joyce Yearwood-Drury and David Powell, and Director of Personnel Jose Gonzalez. *Id.* The plaintiff claims that at the time of her interview she was "still limping and in pain from my fall". Plaintiff's Affidavit, dated July 25, 2014 ("Pl. Aff.") ¶ 34. The plaintiff was also visibly pregnant. Pl. Resp. 56.1 ¶ 48. The plaintiff claims that during the interview, Townes asked her, "Where do you see yourself in five years?" The plaintiff responded, "definitely working in human rights," that she "believed" in human rights and that her children would be "old enough" to allow her some freedom. Pl. Aff. ¶ 37. The plaintiff claims that Yearwood then asked "What about this one?" while pointing at plaintiff's pregnant abdomen, and that all those present laughed. *Id.* ¶ 38. However, while the complaint portrays this incident as intentionally hurtful, the plaintiff testified in her deposition that she perceived the comment as "a joke that was not meant to hurt her in any way."

Pl. Resp. 56.1 ¶ 51.

The plaintiff claims that on March 30, 2011, Gonzalez called her, with Townes present on the phone, to advise her that they had not received plaintiff's civil service exam payment, and that DHR could not "finalize" the plaintiff's permanent appointment until that payment was "sorted out . . . ." Pl. Aff. ¶ 40. The plaintiff says that she was "excited to hear that I had been selected for the permanent position." *Id.* ¶ 41. The plaintiff also claims that when she asked Gonzalez on April 1, 2011 to which office she was going to be permanently appointed, Gonzalez responded, "to the Brooklyn office, because that is where you worked." *Id.* ¶ 42. The defendants dispute whether Gonzalez ever told the plaintiff that she had been selected for a permanent position in the Brooklyn office. Def. Resp. 56.1 ¶ 96.

On April 4, 2011, the plaintiff's doctor's office sent DHR's Human Resources Officer, Linette General, an updated medical note, indicating that the doctor would be reevaluating her by the end of the week. *Id.* ¶ 68. On the same day, Townes sent the plaintiff an email stating that the plaintiff had failed to report to work that day. *Id.* ¶ 100. Later that same day, Gonzalez called the plaintiff to inquire about her medical condition; the plaintiff responded that she had been examined but was not given any information. Pl. Aff. ¶ 48. The plaintiff claims that Gonzalez then confirmed that the plaintiff had been listed as 100% disabled with the New York State Insurance Fund. *Id.*

The defendants claim that the plaintiff failed to keep her supervisor apprised as to when she would return to work despite being directed to do so, and that she did not report to work on the date she was expected back. Def. Resp. 56.1 ¶ 84. On April 4, 2011, Townes sent the plaintiff an email stating that the plaintiff had failed to report to work that day, threatening to suspend the plaintiff without pay if "[going forward] a medical note is not submitted in timely manner." *Id.* ¶ 100. The plaintiff states, however, that she was in contact with DHR's Human Resources personnel and her co-workers and supervisors throughout her disability leave. *Id.* For example, the plaintiff's

chiropractor provided a note to DHR's Human Resources Officer estimating that the plaintiff could return to work on March 4, 2011. *Id.* ¶ 86. On March 4, 2011, the plaintiff's chiropractor sent General a follow-up note revising the return date to April 4, 2011. *Id.* ¶ 90. And on April 4, 2011, the plaintiff's doctor faxed General an updated note indicating that he would be reevaluating the plaintiff on April 7, 2011. *Id.* ¶ 98. The defendants counter that these notes were not direct communications with the plaintiff's supervisors, such as Townes—a point that the plaintiff does not dispute. *Id.* On April 6, 2011, Ali Jafri, the DHR's Associate Personnel Administrator, at the direction of Gonzalez, called the plaintiff and informed her that she had not been selected for a permanent position and that her provisional position would expire on April 13, 2011. *Id.* ¶ 22.

The plaintiff also claims that on April 13, 2011, Yearwood informed her that she had specifically selected the plaintiff for a permanent position to the DHR's Brooklyn office and had informed Townes and Gonzalez of her selection on the day of the plaintiff's March 9, 2011 interview. Pl. Resp. 56.1 ¶¶ 20, 110. The plaintiff also claims that Yearwood told her how "sorry" she was about the plaintiff's "termination" and that she did not agree with the decision, that Yearwood had selected the plaintiff because she had scored 100% on the exam and "because of the high quality of [plaintiff's] work coupled with two years of experience in the position," and that it was Townes who had reversed the decision and de-selected the plaintiff. *Id.*; Def. Resp. 56.1 ¶¶ 108-109. However, Yearwood denies ever telling the plaintiff that she had selected the plaintiff for a permanent position, and claims that essentially all she said during the conversation was "sorry." *Id.* The defendants also state that Yearwood did not have the authority to hire anyone; rather, DHR Commissioner Galen Kirkland was solely responsible for deciding who to hire, and that he made these decisions without consulting Townes. *Id.* ¶¶ 61, 108; Pl. Resp. 56.1 ¶ 21. The plaintiff disputes whether Kirkland was involved in the hiring of HRS Is, and argues that Kirkland took advice from his directors about hiring. *Id.* ¶¶ 61-62.

On March 18, 2011, DHR hired Johnnayea Kennedy, Raed Issa, and Yi Zhu for permanent HRS I positions.  Pl. Resp. 56.1 ¶ 23.  Zhu was hired for a Chinese language position, for which plaintiff was not eligible.  *Id.*  Kennedy was hired to the Syracuse office, and Issa and Zhu were hired to the Lower Manhattan office.  *Id.*  Kennedy was eight months pregnant at the time of her hiring. *Id.* ¶ 25.  She scored 100% on the HRS I exam and had been a provisional employee longer than plaintiff.  *Id.* ¶ 26.  Issa scored 100% on the HRS I exam, was fluent in Spanish, and had been a provisional employee longer than plaintiff.  *Id.* ¶ 27.

On August 11, 2011, DHR hired Halle Jones, Froebel Chungata, and Julianna Yanez for permanent HRS I positions.  *Id.* ¶ 24.  Jones was hired to the Upper Manhattan office, Chungata was hired to the Brooklyn office, and Yanez was hired to the Buffalo office.  *Id.*  Jones and Chungata both scored 100% on the exam and were admitted to practice law in New York at the time of their hiring, unlike plaintiff.  *Id.* ¶¶ 29-30.  Yanez scored 70% on the civil service exam, but was eligible for consideration under the Civil Service Law because candidates with higher scores, including the plaintiff, were not interested in a position in the Buffalo office.  *Id.* ¶ 33.  Again, the plaintiff asserts that she never said that she was uninterested in working in the Buffalo.  *Id.*

The parties also disagree over the quality of plaintiff's performance during her tenure as a provisional employee.  While the plaintiff claims that she was an "excellent employee," the defendants note that her performance evaluation identified a lack of focus, the need for better caseload management, and 23 instances of tardiness.  Def. Resp. 56.1 ¶¶ 63-64.  The plaintiff admits to instances of tardiness, but only by a few minutes, and claims she always stayed late to make up the time.  *Id.* ¶ 64.  The defendants also note that the plaintiff closed a below-average number of cases per year—a point she does not dispute.  *Id.* ¶ 65.

### B.    Procedural History

The plaintiff filed this action in the Supreme Court of the State of New York, Bronx County,

on January 16, 2012.  Dkt. No. 1.  On February 25, 2013, the defendants removed the action to this Court.  *Id.*  On June 13, 2014, the defendants filed a motion for summary judgment on all of plaintiff's claims.  Dkts. No. 45-49.  The plaintiff filed an opposition to the motion on July 25, 2014, Dkts. No. 57-62, and an amended supporting memorandum of law in opposition on August 8, 2014, Dkt. No. 68.  The defendants submitted their reply to the opposition on August 14, 2014.  Dkt. No. 72.

## II.     DISCUSSION

### A.     Standard of Review

The defendants are entitled to summary judgment if they can show that "there is no genuine dispute as to any material fact and that [the defendants are] entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)).  A dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," while a fact is material if it "might affect the outcome of the suit under governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In determining whether there exists a genuine dispute as to a material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (citing *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir. 2003)).

To defeat a motion for summary judgment, the plaintiff "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)).  "[M]ere speculation or conjecture as to the true nature of the facts" will not suffice.  *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citations and internal quotations omitted).  Nor will wholly implausible alleged facts or bald assertions that are unsupported by evidence.  *See Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991); *Argus Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 45 (2d Cir. 1986) (citing *Matsushita*, 475 U.S. at 585-86).

B.     **Analysis**

1.     Rehabilitation Act Claim

a)     *Termination on the Basis of Disability*

The plaintiff claims that she was terminated as a result of her disability in violation of the Rehabilitation Act of 1973.  Courts analyze claims of discriminatory termination under the Rehabilitation Act using the familiar burden-shifting test established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Under the *McDonnell Douglas* test, the plaintiff bears the initial burden of establishing a prima facie case by demonstrating "(1) that the plaintiff is handicapped within the meaning of the Act; (2) that the plaintiff is otherwise qualified to perform the job; (3) that the plaintiff was discharged because of his or her handicap; and (4) that the employer is a recipient of federal assistance."  *Kinsella v. Rumsfeld*, 320 F.3d 309, 314 (2d Cir. 2003).  "After the plaintiff has established a prima facie case, the burden shifts to the defendant to provide a legitimate non-discriminatory reason for the discharge.  The plaintiff retains the ultimate burden of persuasion and must show, using 'evidence constituting the prima facie case, together with supportable inferences to be drawn from the false or erroneous character of the employer's proffered reason,' . . . that the defendant's proffered reason was pretextual."  *Id.* (internal citations omitted).

*Plaintiff Fails to Make a Prima Facie Case Because She Was Not Disabled*

In this case, no reasonable jury could find that the plaintiff was disabled within the meaning of the Rehabilitation Act.  Therefore, she has failed to establish a prima facie case of discrimination under the Rehabilitation Act.

The Rehabilitation Act defines the term "individual with a disability" by cross reference to the Americans with Disabilities Act (the "ADA").  *See* 29 U.S.C. § 705(20)(B).  There, the term disability is defined with respect to an individual as "(A) a physical or mental impairment that

8

substantially limits one or more major life activities of such individual; (B) a record of such an

impairment; or (C) being regarded as having such an impairment . . . ."  42 U.S.C. § 12102(1).  In

determining whether the plaintiff falls within the definition of an individual with a disability under

the Rehabilitation Act, cases that interpret the definition of a disabled person under the ADA are

instructive.  *See, e.g., Weixel v. Board of Educ. Of City of New York*, 287 F.3d 138, 146-48 (2d. Cir. 2002),

*superseded by statute on other grounds by* 42 U.S.C. § 121012(3)(A) (using same analysis to determine

whether plaintiff was disabled within meaning of both ADA and Rehabilitation Act).

The plaintiff argues that she suffered from a physical impairment that substantially limited a

major life activity.  To establish such an impairment, the plaintiff must show (1) the presence of a

mental of physical impairment, (2) that the impairment affects a "major life activity," and (3) that the

impairment "substantially limits" this major life activity.  *Id.* at 147.  The plaintiff principally argues

that the injuries resulting from her slip and fall constitute a physical impairment that substantially

limited her ability to walk, bend, or stand for an extended period of time.  Those activities fall within

the categories of "major life activities" defined in the ADA.  42 U.S.C. § 12102(2).  Therefore, for

purposes of this motion, the Court accepts as given both that the plaintiff was injured in her fall and

that the injuries resulting from the fall temporarily affected one or more "major life activit[ies]."

The issue, then, is whether the plaintiff's short term physical impairment substantially limited her

major life activities within the meaning of the Rehabilitation Act.

In order to determine what constitutes a "substantial limitation," courts have looked to

EEOC regulations implementing the ADA.  *See, e.g., Green v. DGG Properties Co., Inc.*, 2013 WL

395484, at *10 (D. Conn. Jan. 31, 2013).  Even though those administrative regulations are not

binding, courts in the Second Circuit afford them great deference.  *See, e.g., Francis v. City of Meriden*,

129 F.3d 281, 283 n.1 (2d Cir. 1997).  The EEOC regulations provide that an impairment is a

disability within the meaning of the statute where "it substantially limits the ability of an individual to

perform a major life activity as compared to most people in the general population.  An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting.  Nonetheless, not every impairment will constitute a disability . . . ."  29 C.F.R. § 1630.2(j)(1)(ii).

The regulations make it clear that "the determination of whether an impairment substantially limits a major life activity requires an individualized assessment."  29 C.F.R. § 1630.2(j)(1)(iv).  The regulations suggest that in order to determine whether an individual is substantially limited, "it may be useful to consider . . . the condition under which the individual performs the major life activity; the manner in which the individual performs the major life activity; and/or the duration of time it takes the individual to perform the major life activity . . . ."  29 C.F.R. § 1630.2(j)(4)(i). Consideration of those issues "may include, among other things, consideration of the difficulty, effort, or time required to perform a major life activity; pain experienced when performing a major life activity; the length of time a major life activity can be performed; and/or the way an impairment affects the operation of a major bodily function."  29 C.F.R. § 1630.2(j)(4)(ii).

While, as plaintiff correctly points out, the ADA Amendments Act of 2008 (the "ADAA") broadened the definition of a disability under the law, not all impairments are sufficiently substantial to be considered disabilities under the ADA—or, by extension, the Rehabilitation Act.  The EEOC regulations make that point clear.  29 C.F.R. § 1630.2(j)(1)(ii).  As one treatise explains:

> [T]he person must have an impairment that must substantially limit his or her major life activities such as seeing, hearing, speaking, walking, breathing, performing manual tasks, learning, caring for oneself, and working.
>
> Thus, an individual with epilepsy, paralysis, HIV infection, AIDS, a substantial hearing or visual impairment, mental retardation, or a specific learning disability is covered, but an individual with a minor, non-chronic condition of short duration, such as a sprain, broken limb, or the flu, generally would not be covered.
>
> For example, an employee suffers a broken wrist that is expected to heal, but while it is healing he is unable to perform the essential functions of his job as an assembly-line worker. This employee is not protected by the ADA because, although he is

10

"impaired," the impairment does not substantially limit a major life activity because it is of limited duration and will have no long-term effect.

Margaret C. Jasper, Legal Almanac:  The Americans With Disabilities Act § 2.5 (2012).

The example provided in this treatise—concluding that a worker with a short term impairment, like a broken wrist, is not disabled—is consistent with the holdings of cases in this circuit both before and after the implementation of the ADAA.  Short-term injuries, without chronic or long-term impact, are usually not considered substantially limiting impairments within the meaning of the ADA, or, by extension, the Rehabilitation Act.  *See, e.g.*, *De La Rosa v. Potter,* 427 Fed. App'x 28 (2d Cir. 2011) (noting that a temporary impairment lasting only a few months is by itself too short in duration to be substantially limiting); *Nadel v. Shinseki*, 2014 WL 5343331 (S.D.N.Y. Sept. 30, 2014) (finding that a knee injury lasting fourteen weeks was not substantially limiting); *Palmieri v. City of Hartford*, 947 F. Supp. 2d 187, 198 (D. Conn. 2013) (finding that an injury restricting plaintiff's ability to work for one year, with no other long-term impairment, was not substantially limiting); *Wanamaker v. Westport Bd. of Educ.*, 899 F. Supp. 2d 193, 211 (D. Conn. 2012) ("It appears that even under the ADAAA's broadened definition of disability short term impairments would still not render a person disabled within the meaning of the statute.  EEOC interpretative guidance explains that the 'effects of an impairment lasting or expected to last fewer than six months can be substantially limiting within the meaning of this section' however '[t]he duration of an impairment is one factor that is relevant in determining whether the impairment substantially limits a major life activity.  Impairments that last only for a short period of time are typically not covered, although they may be covered if sufficiently severe.'"); *Adams v. Citizens Advice Bureau*, 187 F.3d 315, 316–17 (2d Cir. 1999) (holding that "a temporary impairment of seven months, by itself [was] too short in duration . . . to be substantially limiting . . . ." (internal quotations and citations omitted)).

The injuries resulting from the plaintiff's slip and fall did not render her disabled within the

meaning of the Rehabilitation Act.  The plaintiff's experience is not substantively different from the worker in the example above who broke a bone, but recovered fully.  The plaintiff was injured, and was unable to work for a short period.  However, the record does not substantiate her claim that she was disabled within the meaning of the Rehabilitation Act.

The plaintiff claims that she was disabled as a result of the injuries she suffered from a slip and fall in a DHR bathroom on February 11, 2011.  As a result of her fall, the plaintiff injured her lower back, right hip, and right leg.  Just four days later, on February 15, 2011, the plaintiff wrote an email to Ms. Townes and other DHR officials to report on her condition.  She wrote "Overall, I am feeling much better.  Especially after hearing . . . that everything seems to be fine despite the fall. My tailbone is a little bruised and my back hurts but other than that I think I am much better."  Ex. 13 to Affidavit of Anne Bush.   On February 15, 2011, the plaintiff's chiropractor described her diagnosis as "Lumbrosacral Radicular Syndrome/Lumbosacral Sprain/Strain and Low Back Pain Lumbago."  Letter from Dr. Jeff J. Mollins, D.C., February 15, 2011 (Ex. 15 to Affidavit of Anne Bush).  Dr. Mollins concluded that the plaintiff "is unable to do her job" at that time, but that he estimated that she could return to work by March 7, 2011.  On March 4, 2011, Dr. Mollins wrote another letter with the same diagnosis, concluding that while the plaintiff was still unable to do her job, April 4, 2011—one month later—was an appropriate tentative return to work date.  Letter from Dr. Jeff J. Mollins, D.C., March 4, 2011 (Ex. 19 to Affidavit of Anne Bush).  A short note from Dr. Bhiim S. Nangia, M.D. on March 11, 2011 also stated that the plaintiff had been diagnosed with "Lumbosacral Riculopathy," and that she was still unable to do her job.  Letter from Dr. Bhiim S. Nangia, M.D., March 11, 2011 (Ex. 20 to Affidavit of Anne Bush).  While the plaintiff's doctors wrote to excuse her from work for a period of time because of her injuries, they do not describe any impairments of her life activities, and, therefore, do not substantiate a finding that the plaintiff suffered from a substantial impairment.

Despite her injuries and the fact that she was out of work on medical leave, the plaintiff was able to attend her job interview with DHR on March 9, 2011—just over one month after her fall. Pl. Resp. 56.1 ¶ 92.  At that time, the only consequence of her injuries asserted in the record was that the plaintiff "was visibly limping from her injury and walking very slowly." *Id.*  The plaintiff's doctor cleared her to return to work on April 4, 2011.  Def. Resp. 56.1 ¶ 90.

On April 1, 2011, Dr. Kramer, the independent medical examiner, evaluated the plaintiff. He described her history as follows:  "she slipped on water on the floor in the restroom.  She fell in a sitting position, and landed on her sacrum, right gluteal area and coccyx, and put out her arms to cushion her fall."  Kramer Letter at 1.  Dr. Kramer described his finding that the plaintiff felt some pain in those areas, but he found no permanent injuries.  He said that the plaintiff was taking no medication as a result of the injury—she was given a heating pad.  With respect to future treatment, Dr. Kramer suggested only that "If so cleared by her OB/GYN, she would benefit from physical therapy two times per week for four to six weeks." *Id.* at 3.

Dr. Kramer suggested no restrictions on the plaintiff's activities as a result of her injuries from the slip and fall.  He wrote:

> Her restrictions are that she should avoid lifting *because she is now pregnant*.  She has no environmental restrictions.  *Secondary to her pregnancy*, she cannot crawl, squat, climb or run. . . .  She has no problem reaching or operating a vehicle, and no problem using her hands or upper extremities.  She can probably use the foot control, but she should avoid walking secondary to her mildly antalgic gait.

*Id.* (emphasis added).  Dr. Kramer concluded that it was his opinion that the plaintiff could return to work on May 15, 2011 "noting the above restrictions"—none of which resulted from the slip and fall.  *Id.*

Dr. Kramer's letter includes the sentence that "There is a mildly causally related disability." *Id.* at 3.  The plaintiff's claim of disability rests in large part on that statement.  Indeed, she argues

13

that she became "no longer disabled" on December 23, 2011, the date of Dr. Kramer's next letter. Pl. Resp. 56.1 ¶ 37. The plaintiff posits that Dr. Kramer's statement that there was a "mildly causal disability" in his April 2011 definitively establishes her disability for purposes of the Rehabilitation Act, even though Dr. Kramer's description of her actual limitations runs contrary to a finding that she was substantially impaired at the time. Therefore, in the plaintiff's flawed logic, the disability continued until Dr. Kramer's December 23, 2011 letter.

However, Dr. Kramer's statement that there was a "mildly causal disability" alone does not establish that the plaintiff was disabled within the meaning of the Rehabilitation Act. The letter does not purport to address the legal standard for disability under the ADA. And while the letter contains the word "disability," it contains no evidence of a substantial limitation in the plaintiff's life activities. To the contrary, it describes no restrictions on the plaintiff's activities as a result of her injuries. Dr. Kramer's passing statement by itself does not establish that the plaintiff was disabled. *See De La Rosa v. Potter*, 427 Fed. App'x 28 (2d. Cir. 2011) (holding that form reporting a "disability" under the Federal Employees Compensation Act does not establish the existence of a disability under the Rehabilitation Act); *see also Abdo v. University of Vermont*, 263 F. Supp. 2d 772, 778 (D. Vt. 2003) (". . . the focus of the . . . inquiry is not on the diagnosis itself—indeed a diagnosis alone is insufficient to establish a disability—but is instead on the extent of the limitations caused by the disability.")

In fact, a close examination of Dr. Kramer's December 23, 2011 letter confirms that the plaintiff cannot demonstrate that she was disabled on this record. In Dr. Kramer's later letter, he describes no continuing effects of the plaintiff's injuries from her slip and fall other than "[r]ight-sided lower back pain radiating from the right hip to the right leg. It is worse in the evenings and with cold, rainy weather." Letter from Dr. Mark Kramer, M.D., December 23, 2011 (Ex. 30 to Affidavit of Anne Bush). His examination revealed no deficits in the plaintiff's ability to perform

14

any activity.  The only medication that the plaintiff took at the time was Tylenol.  Dr. Kramer found

that no further treatment was required and stated that "[t]here is no causally related disability."  *Id.* at

3.  Again, Dr. Kramer's statement that there was no "causally related disability" does not mean that

the plaintiff was disabled for purposes of the Rehabilitation Act prior to that date.  Rather, both of

his letters establish that the plaintiff did not suffer from the kind of substantial limitations required

to find that the plaintiff was disabled under the Rehabilitation Act.

The plaintiff has provided some factual allegations regarding the results of her injury in an

affidavit created in support of her opposition to this summary judgment motion.  They do not,

however, substantiate her claim that the injury created a substantial limitation on a life activity within

the meaning of the Rehabilitation Act.   The plaintiff states in a conclusory manner that "As a result

of the fall I was unable to sleep, walk, stand, for more than half an hour without feeling great pain in

my leg, hip, and lower back.  I was completely unable to bend, I could lift things . . . .  However, I

expect that I would return to my job . . . albeit possibly with some reasonable accommodation."  Pl.

Aff. ¶ 49.  She goes on to describe the discomfort that she suffered during the first weeks after the

injury, including the fact that "[w]alking was very difficult without assistance in the beginning.  With

time and therapies it eventually got better."  *Id.*  She concludes her description of the effects of her

injury as follows:  "After having my daughter and to this day, when it gets cold or after walking a

long distance I feel discomfort in my lower back and right leg but I am able to do whatever I need to

do despite the pain."  *Id.*

Standing on its own, the plaintiff's affidavit does not support the conclusion that the

plaintiff suffered from a substantial limitation.  *See Farina v. Branford Bd. of Educ.*, 458 Fed. App'x 13,

15 (2d Cir. 2011) (summary order) (finding conclusory statement of restrictions insufficient to

demonstrate disability); *Sussle v. Sirina Prot. Sys. Corp.*, 269 F.Supp.2d 285, 301 (S.D.N.Y. 2003)

("District courts in the Second Circuit have repeatedly held that a plaintiff's personal testimony

which describes the alleged limits that affect a major life activity, without supporting medical testimony, simply is not sufficient to establish his prima facie case under the ADA." (internal quotation marks omitted)).  In this case, the medical records presented also do not support a finding that the plaintiff suffered from a substantially impairment.  The plaintiff's affidavit demonstrates that the effect of her injuries were of a short term, limited nature, which do not support a finding that she was disabled for purposes of the Rehabilitation Act.

The Court does not minimize the effects of Ms. Martinez's fall.  She was injured and did not work for a period of time while she recovered.  However, the record does not support a finding that she was disabled.  While she did not work for a period as a result of her injuries, the record does not show that her activities were restricted as a result of the injuries.  She was able to attend a job interview one month after the accident, and the only effects of the injury at that time were that she felt some pain and was limping and walking slowly.  Within a few months, she was cleared to go back to work without restrictions.  After a recovery period, she was fully functional.  The Court finds that on these facts the plaintiff cannot make a prima facie showing that she was disabled as defined in the Rehabilitation Act.

Similarly, the plaintiff cannot demonstrate that she had a record of an impairment that substantially limited a major life activity.  This provision requires proof that a "record relied on by an employer indicates that the individual has or has had a substantially limiting impairment . . . that satisfies the ADA; a record reflecting a plaintiff's classification as disabled for other purposes or under other standards is not enough."  *Colwell v. Suffolk County Police Dept.*, 158 F.3d 635, 645 (2d Cir. 1998).  The plaintiff does not meet this requirement as the only records that the defendants could have relied on were the doctors' letters described above, or records of her treatment for the slip and fall.  As described above, any such records would fail to meet standard for disability as defined by the Rehabilitation Act.

The plaintiff may also prove "disability" by demonstrating that her employer "regarded" her as having a disability.  42 U.S.C. §12102(1)(c).  The plaintiff can meet this standard by establishing that she "has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity."  42 U.S.C. §12102(3)(A).  However, this provision may not be invoked with respect to impairments that are "transitory and minor."   42 U.S.C. §12102(3)(B).  "A transitory impairment is an impairment with an actual or expected duration of 6 months or less."  *Id.*

The record does not support a finding that the defendants viewed the plaintiff's injuries as anything other than minor and transitory.  Four days after the fall, the plaintiff wrote her employers that "everything seems to be fine despite the fall" and that her "tailbone is a little bruised and my back hurts but other than that I think I am much better."  Ex. 13 to Affidavit of Anne Bush.  The plaintiff was able to attend her job interview only a month after the injury, and asserts only that the defendants observed her walking slowly and limping.  The plaintiff asserts that she informed the defendants that she cleared to return to work two to three months following her injury—well less than six months required under the statute.  All of this evidence supports a finding that the defendants viewed the plaintiff's injuries as minor and transitory.  As a result, the plaintiff is unable to prove that she was disabled within the meaning of the Rehabilitation Act as a result of the injuries from her slip and fall.

The plaintiff has not made a prima facie case that she was disabled as a result of her pregnancy.  "Every court to consider the question to date has ruled that 'pregnancy and related medical conditions do not, absent unusual conditions, constitute a [disability] under the ADA.'  EEOC regulations, which are entitled to substantial deference in construing the ADA, explicitly exclude 'conditions, such as pregnancy, that are not the result of a physiological disorder.'"  *Martinez v. N.B.C., Inc.*, 49 F. Supp. 2d 305, 308-309 (internal citations omitted); *Cooke v. Berkshire Farm Center*

*and Services for Youth*, 2012 WL 668612, at *5 (E.D.N.Y. Feb. 29, 2012) ("Pregnancy itself does not constitute a 'disability' . . . ."). The plaintiff has not proffered evidence that her pregnancy resulted in any unusual conditions that substantially limited her life activities. As a result, the plaintiff has not established a prima facie case of discrimination under the Rehabilitation Act due to her pregnancy. The plaintiff, represented by counsel, did not bring an action under Title VII for discrimination on the basis of her pregnancy.

*Defendants Have Shown Ample Non-discriminatory Reasons for the Discharge*

Given that the plaintiff has failed to make a prima facie case, the Court could end its analysis here. Nonetheless, the Court will also discuss the remaining prongs of the *McDonnell Douglas* test, as if the plaintiff had satisfied her initial burden.

The defendants have articulated several legitimate, non-retaliatory reasons for not appointing the plaintiff to a permanent position. First, the record shows that the hiring process was very competitive: the plaintiff was one of 117 candidates who scored 100% on the HRS I exam for only seven HRS I permanent positions. Pl. Resp. 56.1 ¶ 12. Second, a number of the candidates selected for permanent positions were at least as qualified, and in several cases, evidently more qualified, than the plaintiff. Kennedy, Issa, Jones and Chungata each scored 100% on the HRS I exam. *Id.* ¶¶ 26-27, 29-30. Kennedy and Issa had been provisional employees for longer than the plaintiff. *Id.* ¶ 26-27. In addition, Kennedy, Jones, and Chungata were admitted to practice law in New York at the time of their hiring, unlike the plaintiff. *Id.* ¶¶ 26, 29-30. Zhu was hired for the Chinese language HRS I position—a position for which the plaintiff was ineligible because she did not speak a Chinese language. *Id.* ¶ 23. Finally, the plaintiff's single performance evaluation during her tenure with the DHR identified a lack of focus, the need for better caseload management, and 23 instances of tardiness. Def. Resp. 56.1 ¶¶ 63-64. The plaintiff closed a below-average number of cases per year. *Id.* ¶ 65.

*Defendants' Proffered Explanations Are Not Pretextual*

The remaining inquiry, then, is whether the record demonstrates a genuine issue of material fact as to whether the defendants' proffered reasons are merely a pretext for impermissible discrimination.  The Court concludes that it does not.  The central evidence of pretext that plaintiff cites—that the employees who were hired "were all less qualified" than her, Pl. Br. at 20—is not supported by the record.  The only other evidence that the plaintiff points to are emails from Ms. Townes that she describes as "terse, out of character . . . ."  Pl. Br. at 20.  Even if the Court were to accept the plaintiff's characterization of the emails as "terse," a terse email alone would be a flimsy basis to support an inference that the defendant's proffered explanation was pretextual.

The particular emails to which the plaintiff points do not support such an inference.  The first is an email from Ms. Townes dated February 16, 2011 asking "Did you come in today?  I am concerned that I have not heard from or seen you."  Ex. 17 to Affidavit of Anne Bush.  Ms. Townes sent that email one day after the plaintiff reported on the consequences of her fall and told Ms. Townes that "everything seems to be fine" but that she was going to a "regular doctor" and that she would let her know "as soon as I get back what he said."  Ex. 13 to Affidavit of Anne Bush.

The second email that the plaintiff points to is dated February 18, 2011, also from Ms. Townes to the plaintiff.  Ex. 17 to Affidavit of Anne Bush.  In that email Ms. Townes expresses her concern because the plaintiff had not written her regarding her status after she saw her doctor, as the plaintiff had promised.   Ms. Townes also expressed concerns regarding the plaintiff's failure to submit proper time records before concluding "I would appreciate it if you would communicate with me a little better, be more mindful of the impact of your absences and my responsibility to monitor them, and submit appropriate attendance records as soon as you can."  *Id.*  The plaintiff responded the same day, apologizing "for not communicating better with you . . . ."  Ex. 18 to

Affidavit of Anne Bush.  The plaintiff also promised "I will be sure to communicate more and am willing to go in to take care of my cards/any outstanding items." *Id.*

These emails do not support an inference that the defendants' rationale for not hiring the plaintiff was a pretext for discriminating against her on the basis of her disability.  The emails were exchanged in the week following the plaintiff's slip and fall at a time when the record does not suggest a concern that the plaintiff's injuries were disabling.  At that point, the plaintiff was out of work, but her chiropractor had set a return to work date of March 7, 2011, less than a month later.  Ex. 15 to Affidavit of Anne Bush.  The plaintiff had informed the defendants that "everything seems to be fine despite the fall.  My tailbone is a little bruised and my back hurts both other than that I think I am much better."  Ex. 13 to Affidavit of Anne Bush.  The emails express concern about the plaintiff's lack of communication, but they do not express concern about her ability to perform her job as a result of her injury or otherwise suggest discrimination on the basis of her injuries.  Plaintiff's proposed inference from these emails cannot be substantiated on this record.

For the foregoing reasons, the defendants' motion for summary judgment is granted as to the plaintiff's claim of discriminatory termination under the Rehabilitation Act.

> b)       *Failure to Accommodate*

The plaintiff claims for the first time in her opposition that the defendants denied her an accommodation for her disability in violation of the Rehabilitation Act.  Pl. Br. at 18.  The Court need not consider a claim presented for the first time in an opposition to a summary judgment motion and will not do so here.[3]  *See Avillan v. Donahoe*, 483 Fed. App'x 637, 639 (2d Cir. 2012) (summary order) ("The district court did not err in disregarding allegations [the plaintiff] raised for

---

[3] The plaintiff's claim would fail in any event because she cannot establish that she was disabled within the meaning of the Rehabilitation Act—the first element in such a claim.  *See McBride v. BIC Consumer Products Mfg. Co., Inc.*, 583 F.3d 92, 96-7 (2d Cir. 2009).

the first time in response to [the defendant's] summary judgment motion."); *Lyman v. CSX Transp., Inc.*, 364 F. App'x 699, 701 (summary order) (2d Cir. 2010) ("An opposition to a summary judgment motion is not the place for a plaintiff to raise new claims." (quoting 5 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1183, at 23 n.9 (3d ed. 2004))); *Greenidge v. Allstate Ins. Co.*, 446 F.3d 356, 361 (2d Cir. 2006) (upholding the district court's denial of the plaintiff's request to amend the complaint in the summary judgment motion as the request was "untimely"); *Levion v. Societe Generale*, 822 F. Supp. 2d 390, 399 n.4 (S.D.N.Y. 2011), *aff'd* 503 F. App'x 62 (2d Cir. 2012) ("Indeed, '[b]ecause a failure to assert a claim until the last minute will inevitably prejudice the defendant, courts in this District have consistently ruled that it is inappropriate to raise new claims for the first time in submissions in opposition to summary judgment.'"(citations omitted)).

> c)      *Disability Retaliation*

Finally, the plaintiff claims that she was terminated in retaliation for taking disability leave in violation of the Rehabilitation Act.  Compl. ¶ 98.  In her opposition, the plaintiff also claims for the first time that she was retaliated against for requesting an accommodation in the form of additional disability leave.  Pl. Br. at 21.  "In order to establish a prima facie case of retaliation, [the plaintiff] must show that:  (1) he engaged in an activity protected by the ADA; (2) the employer was aware of this activity; (3) the employer took adverse employment action against him; and (4) a causal connection exists between the alleged adverse action and the protected activity."  *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002).

For purposes of this motion, the Court will accept that the plaintiff's claim satisfies the first three elements of this claim.  With respect to the fourth element, the only evidence the plaintiff cites to establish a causal connection between the adverse employment action (her termination) and the protected activity (her request for additional disability leave) is temporal:  the plaintiff points out that the decision not to appoint her to a permanent position was communicated to her a mere two days

after her request for additional leave.[4]  Pl. Br. at 21-22.  It is true that "[t]he causal connection

needed for proof of a retaliation claim can be established indirectly by showing that the protected

activity was closely followed in time by the adverse action," *Cifra v. Gen. Elec. Co.,* 252 F.3d 205, 217

(2d Cir. 2001) (internal quotation marks omitted).  However, it is difficult to imply causation by

mere temporal proximity in this case.  Here, the act that resulted in the plaintiff's termination was

the decision to hire someone other than the plaintiff.  The plaintiff was required to leave her job as a

consequence of the decision to hire someone else for the permanent position.  At least some of the

permanent hiring decisions were made before the plaintiff's request for additional leave.  It is

noteworthy that in her brief in opposition, the plaintiff argues that the decision not to appoint the

plaintiff "was communicated" to the plaintiff two days after the request for additional leave—not

that the decision not to appoint the plaintiff was actually made then.  Pl. Br. at 22.  Nevertheless, for

purposes of the motion, the Court will assume that the plaintiff has succeeded in all four elements

and thus established a prima facie case of retaliation.

　　　　Once a plaintiff establishes a prima facie case of retaliation, the burden shifts to the

defendant to articulate a legitimate, non-retaliatory reason for the adverse employment action.  If a

defendant meets this burden, "the plaintiff must point to evidence that would be sufficient to permit

a rational factfinder to conclude that the employer's explanation is merely a pretext for

impermissible retaliation."  *Id.* at 216.  As described above, the defendants have articulated several

legitimate, non-retaliatory reasons for not appointing the plaintiff to a permanent position.  The

remaining inquiry, then, is whether the record demonstrates a genuine issue of material fact as to

whether the defendants' proffered reasons are merely a pretext for impermissible retaliation.  The

---

[4] The other evidence cited by plaintiff which could go to discriminatory motive–Townes' alleged statement upon hearing of plaintiff's pregnancy that: "I guess you are going to be a mom and not a superwoman like me" and Yearwood pointing to her stomach and asking "what about this one" when plaintiff discussed her desire to continue her career now that her children were older—relate only to plaintiff's pregnancy discrimination claim and not her retaliation claim based on her disability leave.  Compl. ¶ 47.

Court concludes that it does not.  The plaintiff argues that the adverse employment action occurred two days after her request for additional disability leave.  Pl. Br. 21-22 (citing Pl. Resp. 56.1).  While this is arguably sufficient to establish the causation prong of her prima facie case, it is insufficient to create a genuine issue of material fact as to whether the defendants' non-retaliatory reasons are pretext.  Temporal proximity is a particularly weak basis for drawing such an inference in this case for the reasons described above.  The other evidence of pretext that the plaintiff cites to is also insufficient.

Accordingly, the Court grants summary judgment with respect to all of the plaintiff's claims arising under the Rehabilitation Act.

### 2.   NYSHRL Claim

Having dismissed the sole claims giving rise to a basis for federal jurisdiction in this case, the Court has discretion under 28 U.S.C. § 1367(c) to either retain or decline to retain jurisdiction over the plaintiff's remaining state law claims.  *See Osborn v. Haley*, 549 U.S. 225, 245 (2007).  A "federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction over a case brought in that court involving pendent state-law claims."  *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988).  "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine . . . will point toward declining to exercise jurisdiction over the remaining state-law claims."  *Id.* at 350 n.7.  Weighing these factors, the Court declines to exercise supplemental jurisdiction over the plaintiff's remaining state law claims.

## III.   CONCLUSION

The Court GRANTS summary judgment in favor of the defendants with respect to the plaintiff's claims arising under the Rehabilitation Act.  The Court declines to

exercise supplemental jurisdiction over the plaintiff's state law claims, and remands them to the

Supreme Court of the State of New York, Bronx County.

    SO ORDERED.

Dated:  February 2, 2015  
New York, New York

                    _____  
                          GREGORY H. WOODS  
                     United States District Judge